AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

| LODGED CLERK, U.S. DISTRICT COURT |
| --- |
| 4/4/25 |
| CENTRAL DISTRICT OF CALIFORNIA BY: _____ MRV _____ DEPUTY |

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| FILED CLERK, U.S. DISTRICT COURT |
| --- |
| 4/7/2025 |
| CENTRAL DISTRICT OF CALIFORNIA BY: _____ IV _____ DEPUTY |

United States of America

v.

ERNEST GERRIAN JOHNSON,

Defendant

Case No.  2:25-mj-02039-DUTY

# CRIMINAL COMPLAINT BY TELEPHONE
# OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 25, 2025, in the county of San Luis Obispo in the Central District of California, the defendants violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 841(a)(1) | Possession with the Intent to Distribute |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Sean D. Lusk, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    April 7, 2025

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA:  _Matt Coe-Odess (x8957)_____

## <u>AFFIDAVIT</u>

I, Sean D. Lusk, being duly sworn, declare and state as follows:

## I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant against ERNEST GERRIAN JOHNSON ("JOHNSON") for a violation of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance).

a.    This affidavit is also made in support of a warrant to search the following digital device (the "SUBJECT DEVICE"), as described more fully in Attachment A: A black Samsung smartphone, with IMEI 350033883289073, currently in the custody of the California Highway Patrol ("CHP") in San Luis Obispo, California.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy to distribute controlled substances) (the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or

investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are on or about those indicated.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Task Force Officer ("TFO") with the FBI assigned to the Central Coast Safe Streets Task Force.  I am also employed as a full-time, sworn law enforcement officer for the California Highway Patrol ("CHP") and have been for the past 25 years.  I am currently assigned to the Coastal Division Investigative Services Unit.  My primary responsibility is to investigate and assist other officers and allied agencies with in-depth investigations involving criminal street gangs, weapons, and narcotics violations.

5.    I attended and graduated from the California Highway Patrol Academy and hold Basic, Intermediate, and Advanced Certificates from California Peace Officer Standards and Training.  I have completed a 72-hour Drug Recognition Expert course certified by the International Association of Chiefs of Police and over 80 hours of narcotics and criminal interdictions training relating to the transportation, concealment, trends, and sales of illegal narcotics and other criminal activities.  I have spoken on numerous occasions with other officers and experts in the field of narcotics interdiction regarding current trends on narcotic sales and trafficking.

6.    As a TFO, I have participated in numerous investigations involving federal firearm and drug offenses and

participated in the execution of numerous arrest and search warrants.  I have also participated in the interviews of defendants, informants, and witnesses who had personal knowledge of firearm and drug trafficking methods.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On February 25, 2025, CHP Officers saw a Yamaha motorcycle ("SUBJECT VEHICLE 1") traveling approximately 30 miles per hour over the speed limit on U.S. 101, within the County of San Luis Obispo.  Officer Hendricks activated his patrol vehicle's emergency lights and siren.  The driver of SUBJECT VEHICLE 1 fled.

8.    After a brief highspeed pursuit, the driver of SUBJECT VEHICLE 1, later identified as JOHNSON, fled on foot before CHP Officers caught and arrested him.  During a search of JOHNSON's person, CHP Officers found and seized suspected narcotics, including approximately 22.8 grams of suspected methamphetamine, approximately 17.3 grams of suspected heroin, and approximately 75.2 grams of suspected fentanyl, and additional suspected narcotics.

9.    On March 5, 2025, FBI TFO Justin Francis saw JOHNSON enter a white 2011 BMW 328i ("SUBJECT VEHICLE 2") at a gas station and drive away.  TFO Francis, who recognized JOHNSON, knew that JOHNSON's driver's license was suspended.  San Luis Obispo Sheriffs K-9 Deputy Tyler Brixey subsequently attempted to pull SUBJECT VEHICLE 2 over for driving on a suspended driver license, in violation of California Vehicle Code Section

14601.1(a), and having an expired vehicle registration, in violation of California Vehicle Code Section 4000(a).

10.  When Deputy Brixey activated his patrol vehicle's emergency lights and siren, JOHNSON fled in SUBJECT VEHICLE 2. After a brief pursuit, JOHNSON crashed into a fence.  TFO Francis, assisted by Deputy Brixey and me, arrested JOHNSON.  On the ground outside the driver's door, and elsewhere in the vehicle, law enforcement found approximately 265 grams of suspected methamphetamine, other suspected narcotics, and indicia of narcotics sales, including an operational pocket scale.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.  Based on my review of law enforcement reports, conversations with other Law Enforcement Officers, my review of video and audio recordings of JOHNSON's arrests on February 25, 2025 and March 5, 2025, and my own knowledge of the investigation, I am aware of the following:

   **A.    February 25, 2025 CHP Officers find narcotics on JOHNSON's person after arresting him for evading a peace officer.**

12.  On February 25, 2025, CHP Officers R. Chavez and M. Hendricks saw SUBJECT VEHICLE 1 traveling approximately 30 miles per hour over the speed limit on U.S. 101, within the County of San Luis Obispo.  Officer Hendricks activated his patrol vehicle's emergency lights and siren and the driver of the speeding SUBJECT VEHICLE 1 fled.

13.  After a brief highspeed pursuit, the driver of SUBJECT VEHICLE 1, later identified as JOHNSON, fled on foot before CHP

Officers caught and arrested him. During a search of JOHNSON's person, CHP Officers found and seized suspected narcotics, including approximately 22.8 grams of suspected methamphetamine, approximately 75.2 grams of suspected fentanyl, and additional suspected narcotics.[1] Several samples of the suspected narcotics tested positive for methamphetamine and fentanyl. Officers also located the SUBJECT DEVICE in JOHNSON's right front overall pocket.

14. During a *Mirandized* interview, when asked what type of drugs he had in his possession, JOHNSON replied, "Cocaine, heroin, a little bit of everything".

**B. On March 5, 2025, law enforcement find narcotics after JOHNSON again fled a traffic stop.**

15. On March 5, 2025, TFO Justin Francis saw JOHNSON driving SUBJECT VEHICLE 2. San Luis Obispo Sheriffs K-9 Deputy Tyler Brixey attempted to conduct a traffic stop on SUBJECT VEHICLE 2 for a violation of California Vehicle Code Section 14601.1(a), driving on a suspended driver license, California Vehicle Code Section 4000(a), expired registration, and to execute a state search warrant for SUBJECT VEHICLE 2.

16. When Deputy Brixey activated his patrol vehicle's emergency lights and siren, SUBJECT VEHICLE 2 accelerated and fled. SUBJECT VEHICLE 2 eventually collided with a vinyl fence. and became stuck in the dirt.

17. Deputy Brixey ordered JOHNSON to get out of SUBJECT VEHICLE 2. JOHNSON did not comply and continued to attempt to

---

[1] All approximate amounts include original packaging.

5

drive away by revving the engine.  During this time, TFO Francis
and I arrived on scene.  JOHNSON continued to ignore orders to
exit SUBJECT VEHICLE 2.  I saw JOHNSON appear to access a
backpack inside SUBJECT VEHICLE 2 and suspected JOHNSON might be
attempting to discard or destroy evidence.  JOHNSON finally
exited SUBJECT VEHICLE 2 through the passenger side door and was
arrested.

18.  TFO Francis saw suspected methamphetamine lying on the
ground outside of SUBJECT VEHICLE 2 near the driver-side door.
Law enforcement found additional methamphetamine on the floor of
SUBJECT VEHICLE 2.  In total, law enforcement found
approximately 265 grams (including original packaging) of
suspected methamphetamine, other suspected narcotics, two
digital scales, and a box of clear unused sandwich bags.
Several samples of the suspected methamphetamine tested positive
for methamphetamine.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

19.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

19.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

20.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

21.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

22.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress [TARGET]'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of [TARGET]'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

20.  For all the reasons described above, there is probable cause to believe that JOHNSON violated 21 U.S.C. §§ 841(a)(1),

possession with intent to distribute a controlled substance.

Further, there is probable cause to believe that the items

listed in Attachment B, which constitute evidence, fruits, and

instrumentalities of violations of the Subject Offenses,

will be found on the SUBJECT DEVICE, as described in Attachment

A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 7th day of
April, 2025.



HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A-1</u>

<u>PROPERTY TO BE SEARCHED</u>

A black Samsung smartphone, with IMEI: 350033883289073, Booked
as evidence item #250225SL0011-13 at the San Luis Obispo CHP
Area office under case number F013-745-25, seized on February
25, 2025, from JOHNSON's person, and currently in the custody of
the CHP in San Luis Obispo, California ("SUBJECT DEVICE").

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy to distribute controlled substances) (the "Subject Offense"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from the SUBJECT DEVICE and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from the SUBJECT DEVICE and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from the SUBJECT DEVICE and which relate to the above-named violations;

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

f.    Contents of any calendar or date book;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as

2

viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICE

3.    In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search the SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search the SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed one year from the date of issuance of the warrant.  The government will not search the SUBJECT DEVICE beyond this one-year period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in the SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        f.  If the search determines that the SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

        g.  If the search determines that the SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        h.  If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside

the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

        i.  The government may also retain the SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

        j.  After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    4.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

    5.  During the execution of this search warrant, law enforcement is permitted to (1) depress JOHNSON's and/or JOHNSON's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICE (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be

depressed; and (2) hold the device in front of and/or JOHNSON's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.